CONVERSE BRIDGE COMPANY *v.* CARRIE O. GRIZZLE.*

(*Knoxville.*   September Term, 1907.)

1. **MASTER AND SERVANT. Master's duty to furnish safe tools and implements and to take notice of defects, when.**
   It is the master's absolute duty to use active diligence to prevent improper or unsafe tools or implements being furnished to an employee by which he may be injured; and it is not necessary that the master should be advised of the particular defects causing the injury; but he is liable if the defects were of such character that it was his duty to take notice of them. (*Post, p.* 692.)

   Cases cited and approved:   Guthrie v. Railroad, 11 Lea, 372; Bruce v. Beal, 99 Tenn., 304; Morriss v. Bowers, 105 Tenn., 64.

2. **SAME. Same. Master's continuing duty to inspect appliances used by his servants.**
   The master is not only bound to furnish safe appliances in the first instance, but must exercise proper diligence to keep them safe, and cannot disregard the duty of inspection simply because the appliance has always performed its functions properly. (*Post, pp.* 692-697.)

   Cases cited and approved:   Bruce v. Beal, 99 Tenn., 304; Morriss v. Bowers, 105 Tenn., 64; Welsh v. Cornell, 49 App. Div., 203, 63 N. Y. Supp., 44; Houston v. Bush, 66 Vt., 331; Scandel v. Construction Co., 50 App. Div., 512, 64 N. Y. Supp., 232; Dyer v. Bridge Co., 198 Pa., 182.

---

*As to duty of master to inspect tools or implements furnished servants, see note to Gulf, C. & S. F. R. Co. v. Larkin (Tex.), 1 L. R. A. (N. S.), 944.

Bridge Co. v. Grizzle.

3. **SAME.** Master's liability for injury from defective appliance on ground of negligence; case in judgment.

Where a servant is ordered by the master from his regular employment to assist in moving some heavy metal by a derrick, constructed of pine timbers, in use for about five years, and standing in the same position for nearly two years, without any inspection shown or appearing, and because of the rotten condition of its timbers, it collapsed while in use, causing the servant's death, the master will be liable in damages on the ground of his failure to exercise proper diligence to keep the derrick in safe condition.

4. **SAME.** Same. No error for refusal to give peremptory instructions directing a verdict in such case.

In such case as that shown in the foregoing headnote, there is no error in the refusal of the trial judge to direct a verdict upon the request of defendant for peremptory instructions. (*Post, pp.* 686, 687, 694, 697.)

---

FROM HAMILTON.

---

Appeal in error from the Circuit Court of Hamilton County.—M. M. ALLISON, Judge.

SMITH & CARSWELL, for Bridge Co.

HEAD & FORD, for Grizzle.

MR. JUSTICE MCALISTER delivered the opinion of the Court.

The plaintiff below recovered a verdict and judgment against the bridge company for the sum of $5.000 as damages for the negligent killing of her husband, George W. Grizzle. The company appealed and has assigned errors.

The cause of action alleged in the declaration was that the defendant company was engaged in the business of making steel bridges, and in the conduct of its business employed a derrick, constructed for the main part of wood, located just outside of a shed, and used in hoisting, handling, and moving heavy material. It is then alleged that the husband of plaintiff, G. W. Grizzle, was employed by the - defendant company to work under the shed, and not on the outside; but that in June, 1906, deceased was ordered to leave his work to assist in loading and operating the derrick, and that while so employed the derrick gave way and fell upon deceased, killing him. It is alleged that the place where deceased was sent to work was unsafe and unsuitable by reason of the imperfect location of the derrick, its want of strength for the heavy load attempted to be lifted, its old and worn condition, and the fact that the braces and timbers and other material of the derrick were old, rotten, and not of sufficient strength and size, and not securely and safely attached and fastened at the base of the derrick, so as to hold and sup-

port the structure. It is alleged that the lower part of the derrick was attempted to be fastened in the soil by means of braces extending into and under a box, with rocks over and around the brace or braces, so that the same could not be seen at the lower end, and at the time of the accident these braces gave way and pulled loose from the lower fastening, on account of being old, rotten, and insecurely fastened.

It is then alleged that plaintiff's husband was taken from a much safer work, which he understood, and was ordered to work at the derrick, a dangerous place, without being warned of its rotten and dangerous condition, or given any instructions how to do the work or avoid the danger. It is further alleged that the dangerous condition of the derrick was known to the defendant company, or could have been known by the exercise of ordinary care and caution, but was unknown to plaintiff's husband.

The defendant company interposed a plea of not guilty. Defendant introduced no testimony, but at the conclusion of plaintiff's testimony moved for peremptory instructions. This motion was overruled by the trial judge, and the cause submitted to the jury on plaintiff's testimony, with the result already stated.

The main contention on behalf of the defendant company in this court is that the trial judge erred in refusing to direct a verdict in behalf of the defendant, since there was no evidence on which a verdict could be based

in favor of the plaintiff.   This assignment of error calls
for a review of the testimony.

It is admitted that the deceased was regularly em-
ployed in riveting tubes inside the shed, but a short time
before the accident was ordered by the foreman to as-
sist in moving some heavy pieces of metal, called "an-
gles," for the purpose of placing them in a car.   On
account of their weight these angles were lifted by a
heavy derrick.   The construction of the derrick is thus
described:   It had a straight mast, which stood upon a
frame and was supported by two beams, known as "stiff
legs."   The whole structure stood upon a frame or plat-
form of heavy beams about four or five feet above the
ground.   Around the end of the stiff legs, which were
bolted to this framework, were placed pens made of
cross-ties and filled with large rock, coming up some
three feet on the stiff legs.   The object of this arrange-
ment was to make a counterweight for the weight that
was to be lifted by the derrick.   The mast moved lat-
erally on a pivot at the top and bottom, which moved
in properly arranged iron plates, the top plate being at-
tached to the upper ends of the two stiff legs; the stiff
legs acting thus as braces and standing at an angle of
some thirty or forty degrees, and being, of course, to an
extent supported by the top of the mast.   The pens in
which the stiff legs rested were about twenty feet from
the base of the mast.   The stiff leg was the main brace
to hold the upright piece or mast, so that it would carry
the load.   The stiff leg or brace in this derrick was

constructed of pine boards or planks, consisting of three pieces 2x6 and bolted together. It was about twenty feet from the point where the brace was fastened to the mast at the top of the derrick to the point where it went into the pen.

A witness who examined the stiff leg immediately after the accident stated it appeared that some pieces had been nailed onto the bottom where it broke. Another witness arrived on the scene a few minutes after the accident and examined the stiff leg. He stated that it was a rotten structure, and was lying on the ground apart in many places; that it was rotten, and not safe for any kind of business.

This derrick had been in use probably five years and had stood in the same position from one and one-half to two years. At the time of the accident the deceased was engaged in attaching the chain of the derrick to a pile of angles, and while the workmen were attempting to lift the load—only a portion of the weight having been taken by the derrick—it suddenly collapsed; the mast striking the plaintiff's husband, from the effects of which he died.

An examination of the derrick after the accident disclosed that one of the stiff legs had been fractured in the fall, about one foot beneath the surface of the rocks which were placed in the pen, and a further examination revealed that this stiff leg had partially rotted. There was also some evidence tending to show that the cause of the collapse of the derrick was the

breaking away of the mast from the plate at the top. However, one witness, who was turning the crank to lift the load at the time of the accident, testified that he saw the stiff leg give way first. The other witness, who claims that the derrick fell in consequence of the breaking loose of the mast at the top, shows that he was twenty-five or thirty feet away at the time of the accident and not looking in the direction of the derrick. It seems that his testimony was rather a matter of opinion from what he saw after going to the scene of the accident. There can be no question, we think, on this record, that the cause of the falling of the derrick was the breaking of the stiff leg on account of its rotten condition. One witness testifies that the stiff leg that broke was made of pine, about one-half heart and one-half sap, and that the part of the leg which was in the pen was rotten. Another witness stated that the derrick was generally rotten.

It is claimed on behalf of the bridge company that the defect in the stiff leg was latent, and not discernible to ordinary observation by reasonable inspection. It is said that the fracture of the stiff leg occurred about a foot below the point where it was covered with the stone, and that this defect could not have been observed without moving the cross-ties and the stone, and subjecting the stiff leg to a process of cutting or hammering. It is further said on behalf of the company that the proof of plaintiff wholly fails to show a want of

proper inspection of the derrick by the defendant company.

On the subject of inspection of the derrick, we find evidence tending to show that the company had breached its duty in this regard. Frank Brown testified that he had been in the employ of the company for the last five years, that he saw the derrick often, and during this time no repairs had been made, unless it was to fix the pins at the top; and there had been no repairs on the stiff leg and mast during that time. Witness states that the stiff legs in these pens were rotten, and an inspection would have discovered it. The test to be applied was either striking the braces, or inserting some sharp instrument into them, or the rotten condition could have been seen by moving the rocks.

Wilson Kerr was introduced as an expert on derricks. Witness stated that he had had thirty-five years' experience in handling derricks, and there is no difficulty in ascertaining by inspection whether the timbers are sound or not. He was asked what method he had for telling whether they are sound or not. Witness answered: "Why, I examine them by chipping into them, and I can tell in that way. When you drive a nail into them, you can tell whether they are sound or not. There is no trouble in detecting their unsoundness." Witness further stated that it was customary to test wooden derricks before using them to ascertain whether they were intact and able to carry the load, and he did not

consider it safe to use a wooden derrick of that kind
for the purpose of lifting a heavy load without making
this test. Witness was further asked: "What exam-
ination do you make of a derrick? A. Well, I look for
the particular wood out of which the stiff legs are
made, in the first place, to see whether they are sound
or not, and before I take my loads I put a test to see
if everything is all right. You take a stiff leg that may
be apparently dry and all right; but when it is down
in the rock you don't know about it, so it is best to
test it."

The record discloses that plaintiff's husband was
taken from his regular employment and directed to as-
sist in moving these heavy angles without any instruc-
tions whatever. The derrick had not been inspected by
the company, and by reason of the character of the ma-
terial of which it was constructed, its long usage, and
exposure to atmospheric agencies, it had become rotten
and unsound. An examination of this record will dis-
close that, if the proper tests had been applied and pe-
riodical inspection of the derrick made, its unsoundness
would have been discovered. The defendant's foreman,
who had charge of the derrick, was not examined as a
witness; nor was any proof offered on the part of de-
fendant to rebut the *prima facie* case made by the plain-
tiff. The facts touching inspection and knowledge of
the unsoundness of the timbers composing this derrick
were peculiarly within the breast of the foreman of the

company and other employees, who were not examined by the defendant.

The general principles of law applicable to this case are well settled. The general rule is that it is not necessary that the employer should be advised of the particular defects causing the injury. It is enough if the defects were of such character that it was the duty of the employer to take notice of them. The duty of the master is absolute to use active diligence to prevent improper or unsafe tools or implements being furnished an employee by which he may be injured. *Morriss Bros.* v. *Bowers,* 105 Tenn., 64, 58 S. W., 328; *Guthrie* v. *Railroad,* 11 Lea, 372, 47 Am. Rep., 286.

In *Bruce* v. *Beal,* 99 Tenn., 304, 41 S. W., 449, it was said: "An employer cannot continue to use machinery not obviously dangerous without imputation of negligence, merely because it has been in daily use for years and has uniformly been found adequate, safe, and convenient, as the fact that a machine has never given way raises no presumption that it never will."

The court further remarked: "The master is not only bound in the first instance to use reasonable care in the selection of machinery and appliances, but also to exercise reasonable and proper watchfulness to see that they are kept in proper condition, because, however perfect they may be when bought, they are liable from ordinary use and wear to get out of repair, and such care and watchfulness is due to guard against defects that

may arise from use as the nature of the business and the risks incident thereto may demand."

Again, in *Morriss* v. *Bowers*, supra, it was said: "And it is likewise the master's duty to furnish his employees places to work in which they will not be unnecessarily exposed to danger. The master is held responsible for all defects that are discoverable by the application of the usual and ordinary tests, but not for latent defects not thus discoverable."

In view of these well-established principles the defendant company was not authorized to disregard its duty of inspection simply for the reason that the derrick had been properly performing its functions and that apparently it was endowed with its accustomed strength. The exposure of these timbers to atmospheric agencies during a period of five years was sufficient in itself to admonish the company of its deterioration, especially in view of the enormous weights to which the structure was subjected and its habitual use. It would, indeed, have been remarkable if the joints and timbers and braces of this structure, so exposed and so habitually subjected to severe tests of its strength, would not weaken and deteriorate. The company had no right as a matter of law to assume under these circumstances that this structure was intact, but it was charged with an absolute duty of periodical inspection to ascertain its strength. According to the testimony of the expert, Kerr, there is no trouble in definitely ascertaining by tests whether such a mechanical device is sound and

capable of performing the tests to which it will be sub-
jected.

It is said on behalf of the company that the record is
silent on the subject of inspection, and it does not af-
firmatively appear that the company failed in its duty
in this respect.   Two witnesses testified on this sub-
ject.   Bryson, who had been in the employment of the
defendant company for two years, testified that during
the time of his employment he had no knowledge of any
inspection being given this derrick.   The witness Brown
testified that he had been in the employment of this
company for several years, and there had been no repair
of said stiff leg and mast during that time.

We think the jury was warranted in inferring from
this testimony that no inspection had been made by the
company, especially when it is remembered that the
foreman of the company, who had especial knowledge
on this subject, was not introduced as a witness.   The
jury were warranted, also, in finding from the proof
that the stiff leg in question was rotten, and was the
primary cause of the fall of the derrick, and that this
defect could have been discovered by the exercise of
ordinary inspection on the part of the company.

On the subject of inspection, Mr. Labatt, in his work
on  Master  and  Servant  (volume 1, sec. 154), says:
"Such being the character of the master's responsibility,
the existence of the duty of inspection is a necessary
consequence of the fact that the master's obligations
cannot be adequately discharged unless, during the

entire period of which that responsibility is predicated, he takes notice of whatever a reasonably prudent person would have ascertained under the particular circumstances which happen to be involved."

The same author, at section 157, says: "That a master cannot in a majority of instances be pronounced free from negligence, as a matter of law, where the instrumentality which caused the injury had never been inspected at all before the accident, or not at the time when it should have been, is obviously a necessary consequence of assuming that inspection is one of the duties which he owes to his servants. Usually, therefore, the case is for the jury wherever the evidence tends to show such omission to inspect. . . . It has been held that the rule that the performance of a duty may sometimes be presumed is not available in the master's favor, where the question is whether an instrumentality has been duly inspected."

The same author in a note says: "Verdicts for the plaintiff have been sustained where the clamp to which a derrick guy rope was fastened was only inspected once a week. *Welsh* v. *Cornell* (1900), 49 App. Div., 203, 63 N. Y. Supp., 44. In that case the court suggested that there should have been a daily inspection. Where a derrick gave way, owing to the working out of a pin which was, almost every day, subjected to the strain of lifting heavy loads, and had not been inspected for about thirty days before the accident, a verdict for plaintiff was sustained. *Houston* v. *Brush* (1894), 66

Vt., 331, 29 Atl., 380. Where the attachment which held the boom in its place had not been examined for over two years. *Scandell* v. *Columbia Const. Co.* (1900), 50 App. Div., 512, 64 N. Y. Supp., 232. Or, as another case has it, for several years. *Dyer* v. *Pittsburg Bridge Co.* (1901), 198 Pa., 182, 47 Atl., 979.

The author, at section 159, treats of specific circumstances that should put an employer upon inquiry as to the condition of instrumentalities.

"(c) *Length of Time Instrumentality Has Been in Use.*—In view of the natural tendency of an inorganic instrumentality to become less and less safe the longer it is used, a court will not set aside a verdict for the servant which is based upon the theory that the failure to inspect it was culpable, where the evidence shows that it had been a part of the master's plant for such a period that, taking into account the nature of the materials of which it was composed, the functions it was performing, and the various influences to which it was exposed by climatic changes or physical forces, it is not an unreasonable inference that a prudent man would have examined it for the purpose of ascertaining what its actual condition was.

"(d) *Operation of Physical Forces.*—The principle that the master is bound to foresee the ordinary results of the action of physical laws upon the materials of which his instrumentalities are composed, or the materials which those instrumentalities are designed to deal with, entails the consequence that he is bound to

Bridge Co. v. Grizzle.

examine the instrumentalities when there is any reason for apprehending that they may have become abnormally dangerous from this cause."

When these principles are applied to the facts of this particular case, there can be no escape from the conclusion that the bridge company was guilty of a breach of duty in the matter of inspection, and that as a proximate consequence of that negligence, and without fault on the part of the deceased, this accident, so disastrous in its consequences, resulted. No assignment of error is made on the amount of the verdict, and, when the facts disclosed in the record touching the age and character of the deceased are considered, the assessment of damages by the jury could not be claimed to be excessive.

The result is the judgment of the court below must be affirmed.